The issue presented in this case, the subrogation rights of an underinsured motorist insurance carrier when its insured wants to settle with the tort-feasor, has been described as "[t]he single most important unresolved issue concerning underinsured motorist coverage," and it has been said that "[c]losely aligned with the subrogation issue is the question of when and under what circumstances an underinsured carrier can refuse permission to the plaintiff to settle with the liability carrier." 49 Ala. Lawyer 284 (Sept. 1988).
I think that the majority has answered these important questions incorrectly, and I have tried, without success, to convince the majority of its error; therefore, I must respectfully dissent.
 "A dissent in a court of last resort is an appeal to the brooding spirit of the law, to the intelligence of a future day, when a later decision may possibly correct the error into which the dissenting judge believes the court to have been betrayed."
Chief Justice Charles Evans Hughes[1]
While I agree that Auto-Owners, under these facts, should pay its insured the benefits, I believe its rights of subrogation should be protected. Because the majority opinion does not protect Auto-Owners' subrogation rights, I must dissent, and in this dissent, I will discuss what I believe the law should be in situations such as this when the plaintiff wants to settle with the tort-feasor's liability carrier.
Stated briefly, the facts are that plaintiff was injured in an automobile accident, and the tort-feasors wereunder insured. Plaintiff had under insured motorist coverage. He wanted to accept the tort-feasors' policy limits and give the tort-feasors a full release. When he advised his own under
insured carrier, it called his attention to the fact that it had rights of subrogation, which it wanted to be protected. Plaintiff *Page 470 
accepted the tort-feasors' policy limits and gave them a general release, reserving to himself only the right to sue hisunderinsured carrier (Appendix C). When he made demand on hisunderinsured motorist insurance carrier, after he had executed the release, the carrier filed an action to have its rights under the policy determined and declared. The trial judge, at the insistence of plaintiff's counsel, declared that "consent to settle" and "subrogation" clauses in underinsured policies were null and void as violative of the public policy of Alabama.
For a better understanding of the facts and the reasons given by the trial judge, I set out his final judgment:
 "FINAL JUDGMENT
"This action was submitted to the Court for Final Judgment on the pleadings and the stipulation of facts by the Parties together with the exhibits attached thereto and legal briefs of counsel on the 11th day of December, 1987.
"Plaintiff, AUTO-OWNERS INSURANCE COMPANY, a corporation (AUTO-OWNERS'), filed its Complaint for declaratory judgment. AUTO-OWNERS' insured Defendant JOSEPH N. HUDSON ('HUDSON'), counterclaimed for benefits under the underinsur[ed] motorist provisions of the automobile insurance policy issued to HUDSON by AUTO-OWNERS. This case is essentially a claim for underinsured motorist benefits.
 "Issue
"The issue presented in this case is whether the injured insured HUDSON, by releasing the tort-feasors on an automobile accident claim without first obtaining from HUDSON'S insurer AUTO-OWNERS written consent to settle with the [tort-feasors], impaired the subrogation right asserted by his insurer AUTO-OWNERS and destroyed his claim against AUTO-OWNERS for underinsured motorist coverage?
 "Facts
"The Facts have been stipulated to by the Parties (See Stipulation by The Parties filed August 6, 1987.) Their stipulated facts are taken as true. Mobley v. Turner,346 So.2d 427 (Ala. 1977). The pertinent facts are as stipulated:
 "1. On August 7, 1985 HUDSON was seriously injured when a vehicle operated by Otis Finklea, an employee of Phillips Feed Mill ('tort-feasors') collided with HUDSON'S vehicle. The accident was caused by tort-feasors' negligence, the consequence of which HUDSON suffered [substantial] bodily injuries and damages to his person of, at least, the sum of $70,000.00.
 "2. The tort-feasors were insured by State Farm Insurance ("State Farm") under a liability insurance policy with coverage limits for bodily injury of $50,000.00. The tort-feasors had no other liability bonds or insurance policies available to HUDSON. The tort-feasors' liability bonds and insurance policies were, at least, $20,000.00 less than the damages for bodily injury which HUDSON is legally entitled to recover against the tort-feasors.
 "3. At the time of the accident HUDSON, as the named insured had in full force and effect an automobile liability insurance policy with AUTO-OWNERS which included underinsured motorist coverage of $20,000.00 per person. HUDSON demanded of AUTO-OWNERS the underinsured motorist coverage totalling $20,000.00, and AUTO-OWNERS declined payment.
 "4. HUDSON advised AUTO-OWNERS in writing that he was negotiating with State Farm with respect to his claim for bodily injury arising from the accident and that State Farm had tendered to him the full limits of tort-feasors' liability policy coverage for bodily injury in the sum of $50,000.00. AUTO-OWNERS was also advised that HUDSON contemplated releasing all claims that HUDSON had against the tort-feasors as a result of the accident in exchange for their bodily injury policy limits of $50,000.00. Upon becoming so advised, AUTO-OWNERS informed HUDSON in writing that AUTO-OWNERS did not consent to HUDSON'S executing a release or consummating *Page 471 
any settlement with State Farm and the tort-feasors, but that AUTO-OWNERS consented to HUDSON'S pursuing legal action against the tort-feasors.
 "5. State Farm paid HUDSON its liability policy limits for bodily injury in the sum of $50,000.00, plus property damages, and HUDSON executed a release in favor of State Farm and the tort-feasors which, among other things provided that HUDSON specifically reserved all his rights against AUTO-OWNERS under the underinsured motorist provisions of HUDSON'S policy of insurance issued to him by AUTO-OWNERS.
 "6. HUDSON by letter informed AUTO-OWNERS of the $50,000.00 bodily injury settlement payment to him by State Farm and the release of the tort-feasors by him therefor, and HUDSON again made demand on AUTO-OWNERS for payment in the amount of $20,000.00 for bodily injury under the underinsured motorist coverage of his policy. AUTO-OWNERS again denied HUDSON'S request for payment for the underinsured motorist benefits.
 "7. The underinsured motorist coverage provision in HUDSON'S insurance policy with AUTO-OWNERS provides that AUTO-OWNERS is:
 " 'To pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle because of bodily injury sustained by the insured, and arising out of the ownership, maintenance or use of such uninsured motor vehicle;'
"and, the amendatory endorsement thereto provides:
 " 'It is agreed that under Uninsured Motorist Coverage the definition of "Uninsured Motorist Vehicle" is amended to include insured motor vehicles to the extent that the sum of the limits of liability under all bodily injury liability bonds and insurance policies available to an insured person after an accident is less than the damages which the insured person is legally entitled to recover.'
 "8. The underinsured motorist coverage provision in HUDSON'S insurance policy with AUTO-OWNERS further states:
 " 'This coverage shall not apply . . . (b) to bodily injury to an insured . . . with respect to which such insured . . . shall, without written consent of the Company, make any settlement with any person or organization who may be legally liable therefor; . . .'
 "and, the 'CONDITIONS' section of the policy reads, among other things, as follows:
 " '18. SUBROGATION. . . . The insured shall do nothing after loss to prejudice such (subrogation) rights.'
 "Law
"The 1984 amendment to the uninsured motorist statute redefined 'uninsured motorist' to include [an] underinsured motorist. Ala. Code, § 32-7-23, reads in pertinent part:
 " '(a) No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in subsection (c) of section 32-7-6, under provisions approved by the commissioner of insurance for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom; provided, that the named insured shall have the right to reject such coverage; and provided further, that unless the named insured requests such coverage in writing, such coverage need not be provided in or supplemental *Page 472 
to a renewal policy where the named insured had rejected the coverage in connection with the policy previously issued to him by the same insurer.
 " '(b) The term "uninsured motor vehicle" shall include, but is not limited to, motor vehicles with respect to which:
 "(1) neither the owner nor the operator carries bodily injury liability insurance;
 "(2) any applicable policy liability limits for bodily injury are below the minimum required under section 32-7-6;
 "(3) the insurer becomes insolvent after the policy is issued so there is no insurance applicable to, or at the time of, the accident; and
 "(4) the sum of the limits of liability under all bodily injury liability bonds and insurance policies available to an injured person after an accident is less than the damages which the injured person is legally entitled to recover.'
"Section 32-7-23 neither (1) requires the written consent of the insurer of the injured person to settle with the tort-feasor, nor (2) grants subrogation rights to the insurer. However, both such exclusionary clauses are found in the policy of insurance now before this Court, and both such clauses are being relied on by AUTO-OWNERS to deny coverage to its insured HUDSON.
"Since the inclusion of uninsured/underinsured motorist coverage is mandatory under our uninsured/underinsured motorist statute, unless specifically waived by the insured policyholder, the State of Alabama delineates what the coverage should be. Higgins v. Nationwide Mutual Insurance Company,291 Ala. 462, 282 So.2d 301 (1973); State Farm Fire and CasualtyCompany v. Lambert, 291 Ala. 645, 285 So.2d 917 (1973); andState Farm Auto. Insurance Company v. Baldwin, 470 So.2d 1230
(Ala. 1985). The purpose of § 32-7-23 is to 'provide coverage.'Higgins, supra; and Baldwin, supra. The injured insured is not required to pursue and secure a judgment against the underinsured motorist before pursuing his claim for underinsured motorist benefits of his automobile insurance policy. State Farm Mutual Automobile Insurance Company v.Griffin, 51 Ala. App. 426, 286 So.2d 302 (1973); and Baldwin, supra. The exclusionary clause contained in underinsured motorist coverage provisions of an automobile insurance policy is invalid as to settlements with insured motorist[s] and the Alabama Uninsured Motorist Statute contains no provisions for rights of subrogation. Alabama Farm Bureau Casualty InsuranceCompany v. Clem, 49 Ala. App. 457, 273 So.2d 218 (1973); andAlabama Farm Bureau Mutual Casualty Insurance Company v.Humphrey, 54 Ala. App. 343, 308 So.2d 255 (1975). The uninsured/underinsured motorist statute is to be construed so as to assure a person injured by an uninsured/underinsured motorist that he will be able to recover, from whatever source available up to the total amount of his damages, and the insurer will not be permitted to insert any provision in its policy limiting such recover by an insured. Clem, supra; andHumphrey, supra.
"When the injured insured party has given his underinsurance carrier notice of a tentative settlement prior to release of the tort-feasor and the insurance carrier has the opportunity to protect its subrogation rights by paying the underinsurance benefits before the release, the release will not preclude recovery of underinsurance benefits, the focus of underinsurance being the amount of damages an insured party suffers for which the tort-feasor is not insured.Progressive Casualty Insurance Company v. Kraayenbrink,370 N.W.2d 455 (Minn.App. 1985). The consent-to-settle clause is contrary to public policy and is void. Elovich v. NationwideInsurance Company, 104 Wn.2d 543, 707 P.2d 1319 (1985).Niemann v. Travelers Insurance Company, 368 So.2d 1003 (La. 1979).
"Holding
 "It is therefore ORDERED, ADJUDGED AND DECREED as follows:
 "1. that the Defendant, JOSEPH N. HUDSON, is entitled to the relief sought in his counterclaim and the same is granted; *Page 473 
 "2. that the consent-to-settle clause in the underinsured provisions of AUTO-OWNERS' policy of insurance with HUDSON is contrary to public policy and is void;
 "3. that the subrogation provision of the automobile liability insurance policy issued by AUTO-OWNERS to HUDSON is not applicable to the underinsurance provisions of said policy of insurance, and as applied to the underinsured motorist provisions of said policy, it is against public policy and is void;
 "4. that the exclusionary clauses in AUTO-OWNERS' insurance policy with HUDSON requiring consent to settle and providing for subrogation rights in AUTO-OWNERS, as applied to underinsured motorist coverage, tends to foster litigation, impede settlement and frustrate the purposes of the underinsured motorist statute of this State; and
 "5. that the Defendant JOSEPH N. HUDSON have and recover of the Plaintiff AUTO-OWNERS INSURANCE COMPANY the sum of $20,000.00 plus interest thereon in the sum of $1,900.00 for a total judgment of $21,900.00, together with costs, for which let execution issue.
"Done this 29th day of January, 1988.
 "s/Robert L. Byrd, Jr. "CIRCUIT JUDGE"
I am attaching to this opinion copies of the correspondence between the parties referred to in the judgment, and a copy of the release, as Appendices A, B, and C, respectively.
Increasingly, this Court is being asked to determine the rights and relations of the various parties in situations involving underinsured motorist coverages, such as that involved in this case. See, e.g. Hardy v, Progressive InsuranceCo., 531 So.2d 885 (Ala. 1988); United Services AutomobileAssociation v. Allen, 519 So.2d 506 (Ala. 1988); Lowe v.Nationwide Mutual Insurance Co., 521 So.2d 1309 (Ala. 1988).
The players, of course, are the injured party, the tort-feasor, the tort-feasor's carrier, and the underinsured motorist coverage carrier. What are their rights and relations? The trial judge thought that "right to consent" clauses and "subrogation" clauses are void. The majority does not go this far, but almost does by citing Hardy, which cites ProgressiveCasualty Insurance Co. v. Kraayenbrink, 370 N.W.2d 455
(Minn.App. 1985).
A distinct minority of jurisdictions has held, as the trial court did, that consent-to-settle clauses and subrogation clauses in underinsured motorist policies are void as against public policy or that they can be enforced only if the benefits are paid before a release is executed. See Progressive CasualtyInsurance Co. v. Kraayenbrink, 370 N.W.2d 455 (Minn.App. 1985) (underinsured motorist coverage carrier must pay the underinsured benefits before its insured executes a release in order to preserve its rights of subrogation); Elovich v.Nationwide Insurance Co., 104 Wn.2d 543, 707 P.2d 1319 (1985) (consent-to-settle clause is contrary to public policy and is void); Niemann v. Traveler's Insurance Co., 368 So.2d 1003 (La. 1979) (subrogation clause is illegal); also, see Alabama FarmBureau Mut. Cas. Ins. Co. v. Humphrey, 54 Ala. App. 343,308 So.2d 255 (1975) ("Alabama uninsured motorist statute [contains] no provisions as to rights of subrogation" and an insurer "will not be permitted to insert any provision in its policy limiting . . . recovery").
Other jurisdictions hold that consent-to-settle and subrogation clauses are valid and can be enforced, and a few jurisdictions hold that an insured who releases the tort-feasor without preserving the rights of subrogation of the underinsured motorist coverage carrier thereby breaches the provisions of the policy and cannot recover under it. SeeStanko v. Hartford Accident Indemnity Co., 121 R.I. 331,397 A.2d 1325 (1979); Porter v. MFA Mutual Insurance Co.,643 P.2d 302 (Okla. 1982); March v. Mountain States Mutual Casualty Co.,101 N.M. 689, 687 P.2d 1040 (1984); Motorists Mutual InsuranceCo. v. Handlovic, 23 Ohio St.3d 179, 492 N.E.2d 417 (1986);State Farm Mutual Automobile *Page 474 Insurance Co. v. Taglianetti, 122 A.D.2d 40, 504 N.Y.S.2d 476
(1986); Miller v. Hanover Insurance Co., 718 S.W.2d 429
(Tex.App. 1986); New Hampshire Insurance Co. v. Knight,506 So.2d 75 (Fla.Dist.Ct.App. 1987). See also, Vogt v. Schroeder,129 Wis.2d 3, 383 N.W.2d 876 (1986); Bogan v. Progressive Cas.Ins. Co., 36 Ohio St.3d 22, 521 N.E.2d 447 (1988); Ruby v.Midwestern Indem. Co., 40 Ohio St.3d 159, 532 N.E.2d 730
(1988); Fladager v. Farm Bureau Mut. Ins. Co., 414 N.W.2d 551
(Minn.App. 1987); Midwest Family Mut. Ins. Co. v. AMCO Ins.Co., 422 N.W.2d 758 (Minn.App. 1988); Klang v. American FamilyIns. Group, 398 N.W.2d 49 (Minn.App. 1986).
The March case, supra, decided by the New Mexico Supreme Court, appears to involve the precise issue raised in this case. The facts of that case are also identical with the facts in the present case. As does Auto-Owners' policy, Mountain States' policy in the March case expressly provided for a right of subrogation in Mountain States and also contained an exclusion clause in the event the insured settled a claim without the insurer's consent. The New Mexico Supreme Court, ruling in favor of Mountain States, held that: (1) the insured's settlement with, and release of, the tort-feasor violated the subrogation provisions, whether the insured's action occurred before or after the insurer's payment of loss; (2) because of the settlement, the insured had clearly violated express policy provisions and had destroyed the subrogation rights of Mountain States; and (3) the insured executed the settlement without the consent of Mountain States and the consent provision of the policy specifically excluded the insured's subsequent claim on Mountain States' policy.
The Supreme Court of New Mexico ruled against the insured, notwithstanding the fact that the New Mexico insurance statutes (like the Alabama insurance statutes) did not expressly provide for subrogation rights; the Court recognized such subrogation rights as "legitimate contractual matters." The New Mexico Court rejected the insured's public policy argument, holding that giving effect to clear contractual language is not "ipso facto" a breach of public policy merely because it "disappoints" the victim of an underinsured motorist. The court also rejected the insured's argument that the consent provision, in effect, gave the insurer the "power to control litigation by forcing the insured to proceed to trial when the insurer refuses to consent to a settlement"; the court noted that the consent provision was not designed to control the insured's access to the courts, but rather to protect the insurer's subrogation rights. The court held that the insured's action "ha[d] completely obliterated" the insurer's opportunity to seek reimbursement from the tort-feasor.
This Court has not addressed the precise issue presented — that is, whether consent to settle and subrogation clauses in underinsured motorist policies are void as being contrary to public policy, but this Court has addressed the question of whether a release of the tort-feasor automatically breaches such clauses in a policy. In United Services AutomobileAssociation v. Allen, 519 So.2d 506 (Ala. 1988), this Court held that the trial court did not abuse its discretion in enjoining the underinsured motorist coverage carrier from withholding its permission and consent for its insured to accept the tort-feasor's policy limits, because "[t]here [was] nothing in the record before us to show that USAA had a reasonable basis for withholding such consent."
I concurred specially in that case only because of the fact that the record did not show why USAA refused to consent. I would point out, however, that in that case there could have been a question of whether the tort-feasor was, in fact, liable. There is a sound suggestion, in that case, that the tort-feasor's carrier preferred to pay its limits and obtain a release. Also, USAA did not file a declaratory judgment to have its rights judicially determined. Cf. Lowe v. Nationwide Ins.Co., 521 So.2d 1309 (Ala. 1988).
The latest case addressing the rights and relationships of the parties in factual settings similar to the one presented here is Hardy v. Progressive Ins. Co., *Page 475 531 So.2d 885 (Ala. 1988). There, this Court reversed a judgment of the trial court that held that the insured's claim against the underinsured motorist carrier was barred by the insured's release of the tort-feasor from liability. This Court found that "[t]he record is without documentation to support the trial court's action" and wrote, "Ms. Hardy alleged that she has complied with all the terms of the policy and performed all other conditions required by law and by the terms of the policy [and] [i]f so, the trial court erred." This Court concluded its opinion by stating, "It is necessary for this to be fully developed," and we sent the case back to the trial court. InHardy, however, this Court did state, in dicta, the following:
 "Underinsured motorist coverage applies where the negligent or wanton tort-feasor has some liability insurance but does not have enough to fully compensate the victims of his negligence or wantonness. Underinsured motorist coverage provides compensation to the extent of the insured's injury, subject to the insured's policy limits. It is an umbrella coverage that does not require the insurer to pay to its insured the amount of the tort-feasor's bodily injury liability limits, as those limits pertain to the insured. Therefore, the insurer has no right to subrogation insofar as the tort-feasor's limits of liability are concerned. Its right of subrogation would be for sums paid by the insurer in excess of the tort-feasor's limits of liability.
 "Some insurance companies have renounced their rights of subrogation for underinsured motorist coverage by provisions within the policies. See, i.e., Silvers v. Horace Mann Ins. Co, 90 N.C. App. 1, 367 S.E.2d 372 (1988); and Branch v. Travelers Idem. Co., 90 N.C. App. 116, 367 S.E.2d 369 (1988). When this has not been done, some courts have fashioned a procedure to release an insured victim from the twilight zone that he is placed in between underinsured coverage and an insurer's right to subrogation. Schmidt v. Clothier, 338 N.W.2d 256
(Minn. 1983) Vogt v. Schroeder, 129 Wis.2d 3, 383 N.W.2d 876 (1986); Hamilton v. Farmers Ins. Co. of Washington, 107 Wn.2d 721, 733 P.2d 213 (1987). Schmidt v. Clothier, supra, involved two unrelated cases that were consolidated, in which plaintiffs were underinsured motorist insureds of Safeco Insurance Company. Each insured was offered a settlement by the respective tort-feasor's carrier, to which Safeco refused to consent. Each insured sought an order authorizing him to accept the settlement and to release the tort-feasor without an impairment of his rights to recover underinsured motorist benefits from Safeco. The trial judge granted the relief, but gave Safeco a 10-day period in which it could pay its insured the settlements offered by the tort-feasors in order to preserve Safeco's subrogation rights. The Supreme Court of Minnesota affirmed, but held that 30 days from the written notice of the tentative settlement agreement was a more reasonable time period. The court concluded that the option afforded Safeco a reasonable accommodation of all the conflicting interests involved.
 "In United Services Automobile Association v. Allen, 519 So.2d 506 (Ala. 1988), this Court held that the trial court did not abuse its legal or judicial discretion in enjoining the insurer from withholding its permission and consent for its insured to accept the tort-feasor's policy limits. In that case, the insurer had refused to consent for almost one year after the consent was requested. In Progressive Cas. Ins. Co. v. Kraayenbrink, 370 N.W.2d 455 (Minn.Ct.App. 1985), the Minnesota Court of Appeals, in holding that an insured's release of an underinsured tort-feasor did not preclude the insured from recovering underinsurance benefits for uncompensated injuries from his insurer, Progressive, despite the destruction of Progressive's subrogation rights, wrote:
 " 'The general rule is that a settlement and release of an underinsured tortfeasor will not automatically preclude recovery of underinsured benefits. Schmidt v. Clothier, 338 N.W.2d 256, 262 (Minn. 1983). When an insured *Page 476 
party has given his underinsurance carrier notice of a tentative settlement prior to release, and the insurance carrier has the opportunity to protect its subrogation rights by paying the underinsurance benefits before the release, the release will not preclude recovery of underinsurance benefits. Schmidt, 338 N.W.2d at 263. If the tortfeasor is released before the insurance carrier makes payment to its insured, however, subrogation rights do not arise.'
"370 N.W.2d at 460."
531 So.2d at 887-88.
I concurred in Hardy, but I do not agree with the dicta inHardy that an underinsured carrier must pay in every case in order to preserve its rights of subrogation. I probably should have dissented because of that, but I did not.
In a case not involving underinsured motorist coverage, this Court, in Lady Corinne Trawlers, Inc. v. Zurich Ins. Co.,507 So.2d 915 (Ala. 1987), was faced with the question of the effect of a release on the subrogation rights of an insurer. There, the Court held:
 "Plaintiff's second argument is that the release was executed subject to Zurich's subrogation rights and, therefore, that these rights were not lost. Plaintiff cites as support for this argument the case of Miller v. Auto Owners Insurance Co., 392 So.2d 1201 (Ala.Civ.App. 1981), wherein the Court of Civil Appeals stated that a release will be regarded as subject to the rights of the insurer-subrogee if the tort-feasor has notice or knowledge of the insurer's subrogation rights at the time the release is executed by the insured. In Miller, however, the insurer had already paid the insured's claim under its collision coverage, and the insured, in return, then assigned the rights, title, and interest to all claims resulting from the accident through a subrogation agreement with the insurer. This Court noted in Barnes v. Tarver, 360 So.2d 953 (Ala. 1978), the following rule:
 " 'Before subrogation or substitution can be decreed, or the right thereto declared to exist, the insurer must have paid the insured his loss according to the contract.' [Emphasis added.]
 360 So.2d at 956, quoting Aetna Insurance Co. v. Hann, 196 Ala. 234, 240, 72 So. 48, 51 (1916). Another difference between Miller and the case at bar is that in Miller, the insurance company had initiated litigation to enforce its subrogation rights two weeks prior to the settlement between the tort-feasor and the insured. In the instant case, no suit had been filed because Zurich's subrogation rights had not yet ripened, due to its failure to reach agreement with the plaintiff on what was owed under the policy. Thus, at the time the plaintiff executed the agreement with Saunders, it was still the owner of any claims against Saunders, and by totally releasing Saunders from any claim against it, the plaintiff effectively destroyed Zurich's rights to subrogation from Saunders."
507 So.2d at 918.
After an examination of Alabama's underinsured motorist insurance statute and the decisions of this Court addressing other issues surrounding the rights and relations of the parties, and after a review of the decisions of other courts that have addressed the question, I am of the opinion that this case afforded us an opportunity to set out some procedural steps, as we did in Lowe v. Nationwide Mutual Ins. Co., supra, to resolve the rights and relations of the various parties involved. The majority, however, affirms an order of the trial court, even though the trial court's order specifically held such clauses void. The result the majority reaches, of course, has the effect of obliterating substantially Auto-Owners' subrogation rights. Therefore, it almost makes such clauses void, as a practical matter. The majority opinion still leaves the bench and bar adrift, without compass, in underinsured settings. *Page 477 
Procedurally, how would I deal with an insured who wants to settle with the tort-feasor's carrier without jeopardizing his underinsured motorist insurance claim? This question was asked and then answered by a lawyer in our neighboring State of Mississippi in a law review article, as follows:
 "In some cases the problem may be avoided by settling with both carriers at the same time. Simultaneous releases to the tortfeasor and both carriers will shift the problems of subrogation and defense from the injured party to the carriers. Unfortunately, this option is usually available only where liability is clear and damages clearly exceed the combined limits of coverage. In many cases, whether the damages exceed the combined limits of the policies is a matter of dispute. The injured party must settle with the liability carrier yet preserve his right to litigate to the extent of his underinsured motorist claim.
 "In some states, the underinsured motorist statutes dictate the procedure for settlement. In Florida, for instance, a statutory procedure is prescribed by which the claimant submits to the underinsured motorist carrier the proposed liability settlement. The carrier must approve the settlement, waive its subrogation rights, and arbitrate the claim, or the unjured [sic] party may file suit against both carriers. In Mississippi, however, as in most states, the procedure for settlement with the liability carrier is not specified in the underinsured motorist statute.
 "Because underinsured motorist coverage is new under the Mississippi statute, no standard procedure has yet arisen for settlement with the liability carrier while preserving the underinsured motorist claim. A procedure which appears to be working in initial cases is as follows: Counsel for the injured party gives notice of the claim to the underinsured motorist carrier as soon as it appears that the underinsured motorist coverage and the insured's damages exceed the tort-feasor's liability limits.[2] When the terms of a proposed settlement with the liability carrier are reached, the proposal is submitted to the underinsured motorist carrier. If the tortfeasor lacks assets from which subrogation may be had as a practical matter, the underinsured motorist carrier may waive its rights of subrogation. Counsel for the injured party requests in writing that the carrier waive its subrogation rights and agree not to invoke as a defense any release or covenant not to sue executed by the injured party. If subrogation is not practical the underinsured carrier, prompted by its duty to act in 'good faith,' will usually waive the subrogation rights and allow its insured to execute the necessary release.
 "If the tortfeasor does have substantial assets in addition to his liability insurance, subrogation may be a right the underinsured carrier will not waive. In such cases a release or covenant not to sue must be drafted to meet the approval of both the tortfeasor's liability carrier and the carrier of the underinsured motorist coverage. Again, unreasonable withholding of such approval could subject either or both carriers to exposure for punitive damages. Insurance companies and their knowledgeable counsel generally cooperate in effecting such settlements."
Phillips, "Underinsured Motorist Coverage in Mississippi," 3 Miss.C.L.Rev. 65, 96, 97 (1982).
I do not understand why the majority applies Lady CorinneTrawlers to an underinsured setting. Lady Corinne Trawlers was not a case involving underinsured motorist coverage; therefore, the majority's holding that the claim must be paid by the underinsured carrier seems quite inequitable to me. While I recognize that in the uninsured or underinsured motorist setting, the insured who suffers a loss at the hands of an uninsured or underinsured motorist *Page 478 
need not, as a condition precedent to his recovering in a direct action against his insurer, secure a judgment against the uninsured or underinsured motorist, he nevertheless must prove that he is "legally entitled to recover damages" against the uninsured motorist within the meaning of § 32-7-23. InState Farm Automobile Insurance Co. v. Baldwin, 470 So.2d 1230,1233 (Ala. 1985), this Court, quoting from State Farm MutualAutomobile Insurance Co. v. Griffin, 51 Ala. App. 426, 431,286 So.2d 302, 306 (1973), stated:
 " 'One must, then, make a determination as to what the words, "legally entitled to recover damages," mean. They mean that the insured must be able to establish fault on the part of the uninsured motorist, which gives rise to damages, and must be able to prove the extent of those damages. In a direct action by the insured against the insurer, the insured has the burden of proving in this regard that the other motorist was uninsured, legally liable for damage to the insured, and the amount of this liability. Note that the insurer would have available, in addition to policy defenses, the substantive defenses that would have been available to the uninsured motorist. See Winner v. Ratzlaff, [211 Kan. 59, 505 P.2d 606 (1972)]; Application of Travelers Indemnity Company, [226 N.Y.S.2d 16 (1962)]; Cox, Uninsured Motorist Coverage, 34 Mo.L.Rev. 1, 34 (1969).' "
The reasoning expressed by the Court of Civil Appeals inGriffin was later adopted by this Court in Quick v. State FarmAutomobile Insurance Co., 429 So.2d 1033, 1034 (Ala. 1983).
When the alleged tort-feasor has liability insurance and the injured party has underinsured motorist coverage, there are complicating factors. The liability carrier generally has a duty to defend, whether its insured is liable or not, and there could be instances in which the liability carrier would rather settle within the policy limits, even though liability might bequestionable, because it might be cheaper than paying attorney's fees, trial preparation costs, and court costs; in other words, the costs of providing a defense might exceed the amount required to settle, and if a liability carrier could effect a settlement and get a release of its obligation to defend, that might be desirable, because an insurer's duty to defend in Alabama is broader than its duty to pay (Samply v.Integrity Ins. Co., 476 So.2d 79 (Ala. 1985)), and a liability carrier could be liable for a negligent failure to settle, and a release would protect it against potential liability in that setting, Dumas v. Southern Guaranty Ins. Co., 408 So.2d 86
(Ala. 1981). Because of these conflicting rights and duties that arise between the two carriers, we should be careful to protect the contract rights of each, but not to protect thetort-feasor, who bought little coverage but did have a contract right to be defended.
The Legislature has not established a procedure for determining how an underinsured motorist insurance carrier can withhold its consent for its insured to settle and give a release to the underinsured tort-feasor, and this Court has not specifically established by court rule or decision the procedure to be used. Necessarily, any procedure must take into consideration the facts and circumstances of each individual case, but the following general rules, in my opinion, should apply: The injured party, or his counsel, should give notice of his or her claim to the underinsured motorist insurance carrier as soon as it appears that the insured's damages exceed the tort-feasor's liability limits. If there is no question about liability, and the liability carrier wants to pay its policy limits and get a release, the proposed settlement should be submitted to the underinsured motorist insurance carrier. If the insured desires that the underinsured motorist insurance carrier waive its subrogation rights, the insured or his or her counsel should request, in writing, that such waiver be given and that the underinsured motorist carrier agree not to invoke as a defense any release or covenant not to sue. The underinsured motorist carrier's decision to waive or not to waive its subrogation rights or to consent or not to consent to a settlement by its insured with the tort-feasor should depend *Page 479 
upon whether the facts showed that its insured was "legally entitled to recover damages" under the provisions of § 32-7-23, and whether, as a practical consideration, the right of subrogation has value. All negotiations should be conducted in good faith, and any releases or covenants not to sue should be drafted to meet the approval of both the tort-feasor's liability carrier and the carrier of the underinsured motorist coverage. If they cannot agree, and such disagreement presents a justiciable controversy, then the injured party should sue to have his or her legal rights determined. Cf. Lowe v. NationwideMutual Ins. Co., supra.[3]
Based on a reading of the entire record in this case, which consists of the pleadings, the stipulation of the parties, the correspondence between the parties, and briefs of counsel submitted to the trial court concerning the legal issues, I can only conclude that Auto-Owners' insured, Hudson, acting upon the advice of his counsel, executed the release of the tort-feasors because he was of the opinion that the consent to settle and the subrogation clauses in Auto-Owners' policy were void as against public policy. See Appendix B.
Hudson's counsel wrote, one day after the release wasexecuted, as follows:
 "Auto-Owners Insurance Company, apparently after being made aware of the fact that Mr. Hudson wanted to accept from the tortfeasor's carrier, State Farm Insurance Company, the policy limits for personal injury are $50,000 and the property damage incurred, refused to consent to Mr. Hudson entering into a release of the tortfeasors on the grounds that Auto-Owners would have rights of subrogation to any payments made under the uninsured provisions of its policy issued to Mr. Hudson. Mr. Hudson, taking the position that Auto-Owners Insurance Company should not and could not force litigation of the accident case and did not have the rights of subrogation under § 32-7-23
of the Code of Alabama applicable to underinsured motorist coverage, accepted the $50,000 personal injury limits of the tortfeasors liability policy and the property damages incurred and executed a release in favor of the tortfeasors, reserving, however, unto himself the right to pursue his underinsured claim against Auto-Owners.
 "The Alabama courts have previously held that policy provisions, requiring the insured first to secure a judgment against the uninsured motorist as to fault and/or damages as a condition preceding to an action on the policy, are unenforceable as being against the legislative intent. See State Farm Fire, vs. Lambert, (Ala. 1973), 291 Alabama 645, 285 So.2d 917, and State Farm Mutual, vs. Griffin (Ala.App. 1973), 51 Ala. App. 426, 286 So.2d 302. We would certainly expect the Alabama courts to apply the rational of Lambert and Griffin and hold that the refusal of the underinsured carrier to consent to settlement with and release of the tortfeasor, in order to protect the carriers subrogation rights, would result in forcing the Plaintiffs to secure a judgment against the underinsured tortfeasor and that such position was violative of the Code sections referred to above and that subrogation is unenforceable by the carrier."
It is plain, therefore, based upon this record, that Hudson released the tort-feasors, in part because he was confident that Alabama law prohibited the inclusion of a subrogation clause in an under insured motorist policy of insurance.
I think that Hudson incorrectly interpreted Alabama law, because it does not prohibit the inclusion of consent-to-settle and subrogation clauses in policies of underinsured motorist insurance; and I think that the order of the trial court holding otherwise is incorrect. I believe, however, that the result the trial court reached in requiring *Page 480 
Auto-Owners to pay its insured the benefits under the policy is correct in its result.
In this case, the parties have stipulated that the tort-feasors were liable. They have stipulated the extent of the damages Hudson suffered. That stipulation, of course, was made in connection with the declaratory judgment action. The only legal question in the declaratory judgment action was whether the underinsured carrier should have the right to go against the tort-feasors, who caused these damages. I think that it should.
I have no disagreement with Hudson's argument that the uninsured motorist laws of this state were adopted to protect individuals like him, and this Court has been liberal in construing the benefits payable under such policies, but this Court has also recognized that persons who operate motor vehicles in this state and cause injuries should carry insurance or be financially responsible to pay any damages they cause. I would hold that the release Hudson executed was subject to Auto-Owners' subrogation rights. This would be an equitable result, because the release executed by the plaintiff in favor of the tort-feasors specifically reserved to the plaintiff the right to recover the benefits payable under the terms of the Auto-Owners policy. See Appendix C. In the Auto-Owners policy, there is a subrogation clause, which states that "[i]n the event of any payment under this policy, . . . the Company shall be subrogated to all the insured's rights of recovery therefor and the insured shall execute all papers required and shall do everything that may be necessary to secure such rights." Consequently, the tort-feasors had noticeor knowledge of Auto-Owners' subrogation rights at the time therelease was executed. In view of these facts, I would hold that the release should be regarded as being subject to those subrogation rights. Lady Corinne Trawlers, supra.
Based on the foregoing, I would hold that Auto-Owners was obligated to pay Hudson the benefits due under the policy, but that the release is subject to the right of Auto-Owners to proceed against the tort-feasors to recover the benefits it pays to its insured under the policy.
Because I believe the Court has fashioned a rule that ignores the various contractual rights of the parties and is inequitable, I must dissent.
The Legislature, in its wisdom, has required financial responsibility and has required the offering of underinsured motorist coverage to persons insured under automobile liability policies issued in this state. Some states have statutorily spelled out the rights and obligations of the various parties when underinsured motorist coverage is involved. Because I believe that this Court has incorrectly construed legislative intent in this area, especially as to when and under what conditions an underinsured motorist insurance carrier "is legally obligated to pay," I would suggest that the Legislature may want to correct the problem.
STEAGALL, J., concurs.
[1] As quoted by Musmanno, "Dissenting Opinions," 6 U.Kan.L.Rev.
407, 410 (1957); and William O. Douglas, "The Dissent: A Safeguard of Democracy", 32 J.Am.Jud.Soc'y 104, 106 (1948).
[2] I understand this sentence to mean that counsel for the injured party should give notice of the claim to the underinsured motorist insurance carrier as soon as it appears that the insured's damages exceed the tort-feasor's liability limits.
[3] Lowe recognizes that an underinsured motorist insurance carrier and the liability carrier have differing duties and obligations, which sometimes must be settled in Court, even though "the alleged tort-feasor's liability insurer and the plaintiff's underinsured motorist insurer are the samecompany."(Emphasis added). If that is true when the two have the same carrier, it is much more true when they have different carriers. *Page 481 
APPENDIX A
June 10, 1986
Mr. Joseph N. Hudson 4358 Midmost Drive P. O. Box 160262 Mobile, AL 36616
 RE: Insured: Joseph N. Hudson Your File: X37-2781-85 Date/Loss: 8/7/85
Dear Mr. Hudson:
We are in receipt of your letter and attachments of May 12, 1986. It is our understanding that State Farm Insurance Company, as a condition of their offer of settlement, may require that you sign a written release releasing all claims that you have against their insured, Phillip's Feed Mill and their driver.
We hereby inform you that if you sign such a release, you will be in direct violation of the following applicable policy language from your insurance policy with Auto-Owners Insurance Company:
 D. "Uninsured Motorist" . . . "This coverage shall not apply: (b). to bodily injury to an insured . . . with respect to which such insured . . . shall, without written consent of the company, make any settlement with any person or organization who may be legally liable therefor."
 18 "Subrogation." . . . "the insured shall do nothing after loss to prejudice such [subrogation] rights." *Page 482 
Mr. Joseph N. Hudson June 10, 1986 *Page Two 
It is the intention of Auto-Owners Insurance Company to enforce the above referenced portions of its insurance policy and Auto-Owners Insurance Company does not consent for you to execute any release or consummate any settlement which, in any way, impairs the rights of Auto-Owners Insurance Company to pursue its subrogation rights against State Farm's insured, Phillip's Feed Mill and their driver.
Your policy also states the following:
 D. "Uninsured Motorist" . . . "no judgment against any person or organization alleged to be legally responsible for the bodily injury shall be conclusive, as between the insured and the company, of the issues of liability of such person or organization or of the amount of to which the insured is legally entitled unless such judgment is entered pursuant to an action prosecuted by the insured with the written consent of the company."
Auto-Owners Insurance Company does extend to you its consent to pursue a legal action against Phillip's Feed Mill and the employee who caused the accident and to pursue this action to final judgment.
We hope you understand the position of Auto-Owners Insurance Company. It is simply enforcing the provisions of its insurance policy so as to protect its subrogation rights against those entities and individuals that caused your injury.
Yours truly,
 REX LEAMON Branch Claims Manager *Page 483 
APPENDIX B
December 18, 1986
Frank G. Taylor, Esq. Attorney at Law 3763 Professional Parkway Mobile, AL 36609
RE: Our Client, the insured, Joseph N. Hudson Your Client, the insuror, Auto-Owners Insurance Auto-Owners File # X37-2781-85 Accident Date-August 7, 1985 Accident Place-Mobile County, Alabama ------------------------------------------------------------- Dear Frank:
As you know, this firm represents Joseph N. Hudson in his claim for payment under the underinsured provisions of an automobile insurance policy issued to him by your client Auto-Owners Insurance Company arising as a result of his accident on August 7, 1985, in which he was severely injured. The rather substantial medical specials, loss wages, and documentations of his permanent injuries and damages have been submitted to Auto-Owners. There appears to be no question but that his case is valued in excess of $75,000. However, if further medical information and other data is needed to satisfy Auto-Owners as to the amount of Mr. Hudson's damages, please advise me and same will be furnished forthwith.
Auto-Owners Insurance Company, apparently after being made aware of the fact that Mr. Hudson wanted to accept from the tortfeasor's carrier, State Farm Insurance Company, the policy limits for personal injury are $50,000 and the property damage incurred, refused to consent to Mr. Hudson entering into a release of the tortfeasors on the grounds that Auto-Owners would have rights of subrogation to any payments made under the uninsured provisions of its policy issued to Mr. Hudson. Mr. Hudson, taking the position that Auto-Owners Insurance Company should not and could not force *Page 484 
litigation of the accident case and did not have rights of subrogation under § 32-7-23 of the Code of Alabama applicable to underinsured motorist coverage, accepted the $50,000 personal injury limits of the tortfeasors liability policy and the property damages incurred and executed a release in favor of the tortfeasors, reserving, however, unto himself the right to pursue his underinsured claim against Auto-Owners.
The Alabama courts have previously held that policy provisions, requiring the insured first to secure a judgment against the uninsured motorist as to fault and/or damages as a condition preceding to an action on the policy, are unenforceable as being against the legislative intent. See State Farm Fire, vs.Lambert (Ala. 1973), 291 Alabama 645, 285 So.2d 917, and StateFarm Mutual, vs. Griffin (Ala.App. 1973), 51 Ala. App. 426,286 So.2d 302. We would certainly expect the Alabama courts to apply the rational of Lambert and Griffin and hold that the refusal of the underinsured carrier to consent to settlement with and release of the tortfeasor, in order to protect the carriers subrogation rights, would result in forcing the Plaintiffs to secure a judgment against the underinsured tortfeasor and that such position was violative of the Code sections referred to above and that subrogation Is unenforceable by the carrier.
Therefore, we, on behalf of Joseph N. Hudson, do hereby demand payment by Auto-Owners Insurance Company of the sum of $20,000 under the terms of the underinsured coverage provisions of the Auto-Owners insurance policy issued to Mr. Hudson and said Code section and the law of this State.
Further, we succeeded in collecting from the tortfeasors' carrier the property damage suffered by Mr. Hudson in the accident, including the sum of $4,425 to which Auto-Owners seek subrogation. If Auto-Owners will waive subrogation of the property damages collected from the tortfeasor, Mr. Hudson will credit the net property damage recovered, after deducting our 1/3 attorneys' fees for collecting same, to the $20,000 underinsured claim of Mr. Hudson against Auto-Owners. The difference could then be paid by Auto-Owners to Mr. Hudson through our office. Alternatively, the underinsured claim of $20,000 may be paid and we will then remit to Auto-Owners the property damage recovered, less our 1/3 attorneys' fees for collecting same. *Page 485 
Please let me hear from you on the manner and means in which your client would like to handle disposition of these claims under its policy issued to Mr. Hudson. Your cooperation is appreciated.
Yours very truly, STOCKMAN BEDSOLE
SAMUEL L. STOCKMAN SLS/rzd pc: Joseph N. Hudson *Page 486 
APPENDIX C
PRO TANTO SETTLEMENT AGREEMENT
KNOW ALL MEN BY THESE PRESENTS, that I, the undersigned JOSEPH N. HUDSON, for and in consideration of the sum of FIFTY-SIX THOUSAND FIVE HUNDRED TWENTY-FIVE and no/100 ($56,525.00) DOLLARS, the receipt and sufficiency of which is hereby acknowledged, do hereby release and discharge OTIS FINKLEA, CLARA PHILLIPS, JERRY PHILLIPS, BILLY PHILLIPS, PHILLIPS FEED MILL and STATE FARM MUTUAL INSURANCE COMPANY, their heirs, executors, administrators, agents and assigns, only, of and from any and all claims, demands, damages, actions and causes of actions on account of any and all injuries or damages, to person and/or property, resulting or to result from an accident which occurred on or about the 7th day of August, 1985, at or near U.S. Highway 90 at Murray Hill Road, Mobile County, Alabama.
I, the undersigned JOSEPH N. HUDSON, specifically reserve all of my rights, claims, demands, damages, costs, expenses, actions and causes of action which I have against AUTO-OWNERS INSURANCE COMPANY, its agents, servants and employees and such other entities that may provide underinsured motorist insurance coverage to me, the said undersigned JOSEPH N. HUDSON. This agreement shall in no way release AUTO-OWNERS INSURANCE COMPANY, its agents, servants and employees, or any other entities that may provide underinsured motorist insurance coverage to me, the said undersigned, from any liability, in contract and/or tort, to me as a result of its and/or their failure and/or refusal to pay me for my loss and damages under the underinsured provisions of the Auto-Owners Insurance Policy issued to me and the applicable statutes and laws of the State of Alabama because of said accident.
It is further understood that all liens and/or subrogation claims arising as a result of any payment made by said AUTO-OWNERS INSURANCE COMPANY to me or on my behalf for automobile *Page 487 
mobile property damage, which payment was made as a result of the above described accident or damages, will be credited on my underinsured claim against AUTO-OWNERS INSURANCE COMPANY or satisfied by me out of the settlement proceeds mentioned above.
As further consideration and inducement for this compromise settlement, the undersigned agrees that all medical and hospital liens and/or bills, including, but not limited to, all hospital, doctor and drug bills or liens incurred presently or to be incurred in the future as a result of the aforesaid accident, if not already satisfied, will be satisfied by me out of the settlement proceeds mentioned above.
To procure payment of the above recited consideration, I hereby declare that I am over the age of nineteen (19) years; that no representations about the nature and extent of said injuries, disabilities or damages made by any physician, attorney or agent of any party hereby released, nor any representations regarding the nature or extent of legal liability or financial responsibility of any of the parties released, have induced me to make this settlement; and that in making this settlement there has been taken into consideration not only the ascertained injuries, disabilities and damages, but also the possibility that the injuries sustained by me may be permanent and progressive and recovery therefrom uncertain and indefinite, so that consequences not now anticipated may result from the said accident.
It is further expressly agreed and understood that no promise or inducement or agreement not herein expressed has been made to or by any of the parties hereto and that this writing contains the entire agreement between and amongst all the parties hereto.
I further state that I have carefully read the foregoing release, do know and understand the contents of said release, *Page 488 
the same having been fully explained to be by SAMUEL L. STOCKMAN, my attorney of record, and to sign the same as my own free act and deed on this the 17th day of December, 1986.
 ________________ JOSEPH N. HUDSON
STATE OF ALABAMA) COUNTY OF MOBILE)
On this the 17th day of December, 1986, before me personally appeared JOSEPH N. HUDSON, to me known to be the person who executed the foregoing instrument and acknowledged that he executed the same as his own free act and deed, with full knowledge of the contents thereof, and for the sole consideration therein expressed.
_____________________________(SEAL) NOTARY PUBLIC, STATE AT LARGE
My commission expires: 10-29-84